# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| STONEY CREEK TECHNOLOGIES, LLC, | : | Bankruptcy No. 07-11085DWS |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Motion for Entry of Interim and Final Orders (i) Authorizing Debtor to Obtain Secured Post-Petition Financing and (ii) Authorizing Use of Cash Collateral (the "Financing Motion") and the Objection thereto by Synthetic Oils & Lubricants of  Texas, Inc. d/b/a Soltex ("Soltex") and M&B Asset Management, Ltd. ("M&B") (together "Objectors") to the Financing Motion.[1]  Also before the Court are (1) Motion to Employ Outsource Financial Inc.; (2) Motion to Pay Pre-Petition Payroll; and (3) Motion for Premium Financing (together with the Financing Motion, the "Motions"). An expedited hearing was held on all the Motions on March 12, 2007.

---

[1]  The bankruptcy case was filed on February 22, 2007.  On February 27, 2007 the Motion was filed seeking a hearing three days later on March 2, 2007.  Given the nature of the relief being sought, I scheduled the hearing for March 12, 2007 to ensure that adequate notice was provided. I also ordered Debtor to file and serve the final loan agreement and budget (not included with the Motion) by March 2, 2007.  Debtor provided the final budget and a real estate appraisal at the hearing but Objectors felt it was in its best interest to proceed as it had brought a witness from Texas.

This is the second attempt by Stoney Creek Technologies, LLC ("SC" ) to take advantage of the reorganization provisions of the Bankruptcy Code.[2]  Its first case, filed under Chapter 11 on January 30, 2007, was voluntarily dismissed on February 6, 2007 after a contested cash collateral hearing at which it became apparent that even with the use of cash collateral, SC could not operate since it had insufficient income to buy raw materials and pay its necessary bills, such as insurance.[3]  It refiled on February 22, 2007 having secured a commitment from Batten Capital Secured Debt Fund I, L.P. ("Lender")[4] to advance $500,000 at closing and an additional $1,000,000 thereafter at its discretion.  Since all of SC's assets are subject to the unchallenged lien held by M&B  and the Lender requires, inter alia, a first lien on all of the Debtor's assets, the Financing Motion is brought pursuant to § 364(d) to obtain credit secured by a senior lien on property of the estate that is subject

---

[2] I shall take judicial notice of the docket entries in this case and the prior case.  Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017.  See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

As Fed.R.Evid. states that a court may take judicial notice at any time and as the parties have not specifically incorporated the record of the hearing on February 2, 2007 at which SC and Objectors actively participated, I will take judicial notice of that transcript as well for purposes of understanding the background of the matters before me.  While a court may not take judicial notice sua sponte of facts contained in the debtor's file that are disputed, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority."  In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995) (citing Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules).

[3] Objectors had pressed for conversion to Chapter 7 which was opposed by the United States trustee.

[4] Lender is one of a number of limited partnerships in the Batten Capital Group LLC that makes secured loans to middle market companies in workouts and bankruptcies.

to a lien.  While the new financing is the vehicle SC has pursued in the consolidated hearing

held on the Motions, there is also pending a request to utilize M&B's cash collateral to

which it also objects.


## BACKGROUND

### A.  Relationship with Objectors

SC, which started in business on July 1, 1998, produces various compounds to be used

as industrial coating in the fuel additive and metal working industries.  SC lost a lot of money

during the years 2001, 2002, 2003, 2004, 2005 or 2006. (Trans. 2/2/07 at 1-79 and 1-80).

During that period SC entered into a strategic alliance with Soltex which was memorialized

in a Commercial Agreement for Product (the "Commercial Agreement") dated March 21,

2005 providing that Soltex would be the exclusive sales and marketing entity for all of SC's

products. Exhibit S-4.  Pursuant to the Commercial Agreement, SC produced its compounds

utilizing raw materials purchased by Soltex.  After closing on the Commercial Agreement

the inventory of raw materials, work in process and finished goods was owned by Soltex and

was to be used to fulfill sales to Soltex customers.[5]  Receivables after closing were likewise

the responsibility of Soltex.  From this arrangement, SC was entitled to a "conversion fee"

so long as Soltex received its guaranteed 15%.

In August 2005 Soltex hired as its Controller, Lynda Davies ("Davies"), a certified

public accountant with over seven years of experience as a financial officer in chemical,

---

[5]  The parties appear to agree that recycled goods and sales to Chemtura are an exception to
Soltex's ownership.

energy and other related industries as well as five years as an audit manager, then partner in public accounting. At the time SC had no financial manager and Davies was charged with the task of reconciling inventory which had presented accounting problems. While trying to assist SC given her employer's big investment in SC, she saw that SC had no financial discipline[6] and that its cost accounting was flawed because it did not consider "yields."[7] Because the yields were not taken into account, the costs were too low and thus the margins that SC reported were skewed. During the period Davies investigated, the margins should have been stated at 27% . With the information she obtained, she prepared a Profit and Loss Summary from July 1, 1998 through October 31, 2006. It confirms losses in every year from 2001 though 2006. Exhibit S-6. The resulting shortfall in revenue during this period was supplied by Soltex which funded labor, utilities and whatever was needed to make product in addition to the raw materials contemplated by the Commercial Agreement.

SC had been financed by Sovereign Bank which held a first lien and security interest on all its assets and had secured a judgment. In June 2006 Soltex formed M&B to purchase for $300,000 the Sovereign note presumably to protect its investment in SC. The amount if that debt, according to SC's President Samuel Thomas ("Thomas"), is $3.1 million consisting of $2.7 million in principal plus $400,000 of interest.

---

[6] She elaborated, stating that SC had a cash focus, merely cutting checks and holding them until it had money, rather than managing its finances in accordance with proper accounting principles.

[7] A certain amount of inventory is lost naturally through the manufacture of product, thereby establishing the "yield." According to Davies, SC did not take that into consideration before costing its product.

### B.  The DIP Loan

On  December 15, 2006 the Commercial Agreement was terminated, and litigation between the erstwhile partners ensued in this court and the state court.  This latest proceeding seeks to reorganize SC through an infusion of new debt that would jumpstart production and achieve profitability.  In furtherance of that end, SC has negotiated with Lender to provide a senior, secured, super-priority credit facility (the "DIP Loan") of up to $1,500,000 to fund SC's working capital requirements during the pendency of the Chapter 11 case. Lender's Managing Partner Thomas Minick ("Minick") testified concerning the terms and conditions of the loan agreement (the "Loan Agreement") and status of the DIP Loan.  Specifically upon fulfillment of  the conditions of closing the Lender will advance in a lump sum $500,000, $70,000 of which will be immediately paid back to Lender as fees.[8]  The DIP Loan will accrue interest at 12%[9] with a $1,500 monthly monitoring fee.

When questioned at some length as to the conditions of closing, Minick identified Lender's need to perform a second site visit and to secure complete documentation with appropriate representations and warranties, a separate representation that SC is not in violation of any agreement or order and this Court's order providing all the protections that it is seeking.[10]  Minick acknowledged that there is no obligation under the DIP Loan to

---

[8]  There is a $30,000 closing fee and a $40,000 expense fund to reimburse Lender for its costs, including those incurred prepetition.

[9]  Upon default the interest rate increases by 4% unless Lender elects otherwise.

[10]  As of the commencement of the hearing, Debtor's counsel had not given the Court or parties a copy of the thirteen-page proposed financing order (the "Proposed DIP Order") it had negotiated with Lender.  Thus no one had not seen it when Minick testified.  I reviewed it at the
(continued...)

advance more than the initial $500,000 but believed it would be forthcoming if the Debtor performs. He stated that there are no specific benchmarks for satisfactory performance but saw no problem if the Debtor is "not substantially outside of the cash flow parameters," "is trending in a positive direction," and has booked sales as represented and has no unexpected expenses. His frame of reference is a budget provided by SC to Lender which is apparently analogous but not the same as the Cashflow presented to the Court. When it was pointed out that the $500,000 advance would be exhausted in less than three weeks, Minick stated that would not be a barrier to considering further advances and that the Lender was not providing the financing in order to foreclose on the Debtor's assets.

## C.  Stoney Creek's Cashflow

Presumably recognizing its deficiencies in managing its finances, SC agreed, upon the Lender's urging, to retain a consultant to provide financial and accounting assistance. It selected Outsource Financial Inc. ("OFI"),[11] which, among several others, was recommended by Lender. The President and sole owner of OFI, Ralph Rehn ("Rehn") was called to testify. While Rehn is not a certified public accountant nor does he have any experience in the chemical industry, he holds a masters of business administration in

---

(...continued)
lunch break as did the UST and Objectors, both of whom objected to its contents even if financing were authorized. Since it was not filed as required under Local Bankruptcy Rule 9014-3(f)(1), I have had the document scanned and docketed. Doc. No. 50.

[11]   Debtor filed an Application to Employ OFI (the "Application") which was me contemporaneously with the Motion. OFI's proposed compensation is $100 per hour plus expenses with a $5,000 post-petition retainer. Objectors objected to the Application contending that there is no economic benefit to retaining OFI given the Debtor's continuing operating losses. I advised the parties I would only consider the Application if I approved the financing. Since I am denying the Motion, I agree that there is no economic benefit to employing OFI.

accounting and has worked in manufacturing.  In anticipation of OFI's engagement, Rehn participated with Thomas and Mark Dwyer[12] in the preparation of an 18 week projected cashflow (the "Cashflow") in support of the Motion after reviewing certain of the Debtor's records and interviewing management.  Exhibit D-1.  In the two weeks that he has been involved in this matter, he has examined the Debtor's available historical financial statements, 2005 tax returns, recent payroll and other operating records which he found sufficient to be comfortable with the business.  He relied on management for information about projected sales and the collection of receivables.[13]

Rehn began by focusing on forecasted sales which he noted reflected committed orders to be shipped in weeks one through five.  During this period sales averaged $112,000. In week six projected sales spike to $232,769.23 where they remain for the balance of the 18 week period.  Rehn stated that the forecasted increase was derived from management and assumes success in the Soltex litigation.  Although neither he nor Thomas  explained what that meant, I gather that it refers to the dispute over the inventory which Soltex has claimed as its own, a position that appears to be substantiated by the Commercial Agreement. While Thomas stated that SC could succeed even if a court ordered the Soltex claimed inventory returned, Rehn stated that he did not know whether the Cashflow would work under that scenario.  I find Thomas' assurances self serving and not credible.

---

[12] Dwyer was identified at the last hearing as the assistant Plant Manager.

[13] He opined that historical receivable collections were not relevant since the Debtor negotiates one on one with the account debtors, perhaps referring to SC's practice of offering 2-5% discounts for early payment.

On the expense side, Rehn opined that expenses were fairly stated based on SC's operating without Soltex. He was questioned as to why if sales double in week nine, the expenses for manufacturing the additional product do not increase. He explained that labor costs are projected to remain constant because, according to Thomas, the present workforce is underutilized.[14] Rehn stated that he did not consider whether there would be an increased need for nitrogen, waste and trash disposal etc. He had no knowledge whether funds were earmarked for compliance with state and federal environmental regulations.[15]

Based on and assuming the accuracy of the foregoing projected revenue and expenses, the DIP Loan advance of $500,000 will be exhausted in week 3, and further funds will be needed.[16] Indeed the Cashflow assumes a continuing increase in the DIP Loan through

---

[14] If true, this raises the question why a distressed company is carrying excess payroll. However, as Rehn did not examine the payroll for a period when sales were at the level in the projections, e.g., for overtime, he relied on Thomas' untested explanation and was "comfortable" with the projected labor cost.

[15] Objectors called Jessica Hartley who is employed by the Pennsylvania Department of Environmental Protection ("DEP") to testify about a recent hazardous and residual waste inspection conducted at SC and the notice of violation that was issued thereafter. Exhibit C-3. DEP found thirteen infractions of the regulations ranging from improper labeling of hazardous waste and improper storage which constitute unlawful conduct and a public nuisance under applicable law and may subject the offender to civil penalty. However, Hartley acknowledged that these were standard violations that could be easily remedied. The required written response to DEP was due on March 2. Thomas was not asked whether it was submitted.

Minick was asked what the impact of environmental violations would have on Lender's commitment, and  stated that he had not reviewed the DEP report. He noted that he was satisfied that there were Phase I and II environmental studies in 1997 and 1998, and Lender needed nothing more current.

[16] This assumes a beginning cash position of $124,728.86 on 3/12/07. At the close of business on Friday 3/9/07, Debtor had no cash. Two receivables were collected on 3/12/07 bringing

(continued...)

week 9 when it starts to decline.    At the end of week 18, the DIP Loan balance is

$747,179.85.  Under the terms of the Loan Agreement, the DIP Loan is due the latest six

months from the closing date, i.e., week 24.  The Cashflow does not extend to week 24 to

project whether sufficient profits will be generated to repay the DIP Loan.

Davies was asked to examine the Cashflow[17] based on her expertise and familiarity

with SC.  She noted that it assumed gross margins in excess of 50% which SC had never

achieved since it understated its costs as a result of ignoring yields.  SC's margins properly

calculated were 27%.  She prepared a profit and loss summary, Exhibit S-6, which reflected

an aggregate $10 million loss from the inception of the business through the first ten months

of 2006.  She testified that during its relationship with SC, Soltex advanced $3.148 million

for raw materials, labor, utilities and other expenses needed to manufacture the product for

Soltex's customers. Exhibits S-8 and S-9, S-10, S-11.

---

(...continued)
the cash balance to approximately $61,000.  The Cashflow indicates a need for cumulative advances
of $577, 856.66 by week 3.  That includes $70,000 of legal retainers which can only be spent with
court approval.  While the Proposed DIP Order carves out a priority position for legal fees, I am
unaware of whether SC is required to keep those funds in reserve for this purpose.  In any event, by
week 4, the shortfall increases to $157,000 clearly requiring a further advance under the DIP Loan.

[17]  She did not have the opportunity to examine Exhibit D-1 since it was not produced until
the hearing.  Rather she examined its predecessor which was filed pursuant to my Order.  Since my
Order was intended to allow a fair review, I will not discount her testimony because of the change
in document which I was led to believe by SC's counsel was not significant.  However, my post
hearing examination of the original cashflow filed on March 2, 2006, Doc. No. 28, shows a
significant disparity with Exhibit D-1, the latter being more favorable to SC.  Whereas Exhibit D-1
shows  a cumulative need for $577,856.69 in week 3, the earlier projection reflected a cumulative
need for $727,001.33.   The DIP Loan in the earlier projection is exhausted in two weeks.
The March 2 projection does not extend past the ninth week so I cannot examine the assumptions
about repayment.  What is especially curious about the two documents is that weeks 1 and 2 which
are fast upon SC have such different assumptions about sales, receipts and inventory cost.
SC's inability to state its financial condition for the next two week further undermines my
confidence in these projections.

## D.  Stoney Creek's Assets

The DIP Loan requires SC to grant Lender a first lien and security interest in all its assets (other than Chapter 5 bankruptcy claims).   Since M&B has an acknowledged existing lien on these assets to secure $3.1 of debt (exclusive of costs), it must be provided adequate protection of that interest as a condition of the granting of a priming lien to Lender. Debtor contends that M&B is adequately protected by the equity cushion in its assets. In support of that position, it secured an appraisal of its real estate (land, building and fixtures) (the "Real Property"), Exhibit D-3, and presented the testimony of its appraiser John Coyle, MAI ("Coyle").[18]  With respect to its personal property, it presented Thomas to elicit value evidence.

Real Property.  The Real Property, as appraised, consists of 11.959 acres (the "Land") containing a 27 building chemical manufacturing complex (the "Buildings") with 30 raw material and finished product storage tanks, two wastewater treatment tanks and one fire water tank (the "Tanks").[19]  It abuts a rail line and an active rail spur enters the property. It is improved to support a heavy manufacturing complex, including concrete dikes and containment structures.   In June 2000 the former owner received an Act 2 Release of Liability Protection from DEP which acknowledged that certain hazardous substances had

---

[18] Coyle who heads his own appraisal firm has been performing real estate valuations since 1972, mainly of industrial properties.  In addition to being a certified real estate appraiser, he is a real estate broker.

[19] The Debtor has additional tanks which have not been included in the appraisal. Coyle considered any tank larger than 30 gallons (the "Large Tanks") to be part of the Real Estate.

been detected. The appraisal report recognizes this condition and assumes that some land would need to be removed to remediate. While the appraisal did not detect any visible environmental problems, the report expressly disclaimed reliance on it for an evaluation of environmental risks.

Determining that the highest and best use for the Real Property is its present use as a chemical manufacturing company, Coyle valued the Real Property at $3,120,000 using a sales comparison approach for the Land and a cost approach for the Buildings, Tanks and other improvements. He allocates $535,000 to the Land and $2,585,000 to the Buildings, Tanks and other improvements. From a research of the nine county Delaware Valley area, Coyle could only find three sales of chemical plants, none very recent and none which relate to the subject. Because of the dissimilarity, he did not make adjustments to those sales prices as he would do if the sales comparison approach was used. Rather he performed a detailed reconstruction cost study which estimated the cost to rebuild the subject in the same shape and configuration as the subject, including its deficiencies. He then depreciated each building, tank and improvement to account for physical deterioration based on its economic age to derive a value for each component. The costs of a sale which could range from 2-7% were not factored into the appraisal. Although he did not research the market for the Real Property, Coyle thought a sale could be accomplished in six months.

<u>Personal Property</u>. Thomas was asked to address the value of the Debtor's accounts receivables, inventory and machinery and equipment. Receivables were identified on Exhibit D-4. Of the $232,886 in actual receivables for product delivered, $124,000 is included as

-11-

cash on the Cashflow and $61,000 has been received.  The balance of the "receivables" are not receivables, but booked sales of product that has not been delivered in the amount of $325,287.  Whether these booked sales are included in the separate inventory of finished goods is was not asked.

Exhibit D-6 represents the inventory ("intermediates and finished goods") as of March 8, 2007 in the amount of $802,888.52 which Thomas contends belongs to SC. The ownership of the inventory since the withdrawal of Soltex from the Commercial Agreement has become blurred.  Thomas has acknowledged that some of the inventory being used to make product presently is from raw materials supplied by Soltex before December 15, 2006.  Other product has been and is being made from raw materials purchased by SC since that date.  What amount of the $802,888.52 is not clouded by Soltex's claim was not established.[20]

Finally a 45-page Equipment List which was prepared by Loeb Equipment and Appraisal Company ("Loeb") at some unknown time was presented.  Exhibit D-7. However, the values on the items were placed by Thomas who testified to 30 years of costing this type of equipment.[21]  He fixes a $2,828,750 forced (i.e., liquidation) value and a

---

[20] Exhibit D-5 was allegedly the Soltex inventory but it was not admitted since Thomas had no knowledge of the schedule.  Moreover his explanation of what it was intended to prove was incomprehensible.

[21] In an attempt to impeach Thomas' credibility, Objectors asked him about the centerfuges which he stated are the most highly valued equipment, ranging from $80,000 to $200,000. He acknowledged that he had tried to sell one centerfuge which was not in use.  Rather than being unsuccessful in such sale, he stated that he decided to keep it and terminated negotiations with the buyer.  Given SC's desperate need for money, it is hard to imagine that he would refuse to sell a large piece of equipment that was not being used.

$5,986,200 unforced value to the items on the Equipment List.  The Equipment List contains

the Tanks which are included in the Real Property appraisal.  While I have no way of

determining whether Coyle and Thomas have placed similar values on the Large Tanks,[22]

they are clearly double counted and the total asset value is overstated to that extent.


## DISCUSSION

I.

Section 364(d) upon which SC relies provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit
> or the incurring of debt secured by a senior or equal lien on property of the
> estate that is subject to a lien only if--
>
> > (A) the trustee [i.e., debtor in possession] is unable to obtain
> > such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of
> > the lien on the property of the estate on which such senior or
> > equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on
> the issue of adequate protection.

11 U.S.C. § 364(d).  "As a general principle, the Bankruptcy Code recognizes the primacy

of pre-petition contractual liens and seeks to preserve the financial interests created thereby."

In re Mosello, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996).  This policy is recognized by

§ 364(d) which permits the priming of an existing lien only as "a last resort."  In the Matter

---

[22]  Although identifying each tank in his report, Thomas provided an aggregate value for
the Large Tanks of $ 772,000.  If they valued the Large Tanks alike, the Thomas values would be
$2,056,750 and $5,214,200.

of Qualtech Steel Corp., 276 F. 3d 245, 248 (7th Cir. 2001).  See also In re Seth Co.,

281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("ability to prime is extraordinary").  Given the

consequences to the existing creditor of a priming lien, the court must be "particularly

cautious" when evaluating whether the subordinated creditor is adequately protected.

Mosello, 195 B.R. at 289 (quoting In re South Savings Ass'n, 820 F.2d 700, 720 (5th

Cir. 1987).

      Although there was no testimony concerning the Debtor's efforts to secure financing,

I am convinced from my knowledge of this case in its present and prior iteration that this is

Debtor's only source of potential financing.  I therefore conclude that the condition of

§ (d)(1)(A) is satisfied.  Whether M&B can be adequately protected should this priming lien

be allowed is the question before me.

      "Adequate protection" as used in § 364(d) and other sections of the Bankruptcy Code

may be provided by (1) periodic cash payments; (2) additional or replacement liens; or

(3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest.

11 U.S.C. § 361.    The last category being a "catch all" allows the bankruptcy court

discretion to fashion adequate protection on a case by case basis.  The Resolution Trust

Corp. v. Swedeland Development Group, Inc., (In re Swedeland Development Group, Inc.,

16 F.3d 552, 564 (3d Cir. 1994).  To meet its burden under § 362(d)(1)(B) Debtor offers

M&B nothing that it already does not have, i.e., a lien on all of Debtor's assets, but argues

that it does not need as much.  Stated in legal terms, it contends that M&B is protected by

the equity cushion[23] in the assets that would exist were it to be subordinated to the Lender's $1.5 million new first lien.[24]

In Swedeland, the Third Circuit Court of Appeals set forth certain principles that are intended to inform bankruptcy judges when considering whether adequate protection for the purpose of § 364(d) has been offered.[25]  The court noted that the prepetition creditor must be provided with the same level of protection it would have had absent the post-petition financing since it is entitled to retain the benefit of its prebankruptcy bargain.  Significantly, it stated that while the policy underpinnings of Chapter 11 are quite important, "Congress did not contemplate that a creditor could find its priority position eroded and as compensation be offered an opportunity to recoup dependent upon the success of a business with inherent risky prospects."  Id. (emphasis added).  See also In re Windsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for the new, post-petition lender.")  Finally, while the existing lender was undersecured in Swedeland so that an equity cushion was not available, the Court

---

[23]   The amount between the value of the collateral securing the creditor's lien and the indebtedness which it secures is commonly referred to as the "equity cushion."

[24]   While the proposed Order provides adequate protection to prior secured parties in the form of (1) a lien on post-petition assets and (2) copies of all financial statements and reports provided to Lender, the adequate protection is more form than substance.  First, the Debtor's business plan does not contemplate any new post-petition assets other than inventory which will be converted into product and sold generating accounts receivable which will be collected to operate the business.  Second, as the Swedeland Court noted, while reports are helpful, they are not substitutes for the more concrete items identified as adequate protection in § 361.  "To put it bluntly, Carteret could not convert them into cash."  Id. at 565 n. 16.

[25]   Noticeably disturbed by the decision on appeal, the circuit court admonished bankruptcy judges in this circuit to require a tangible demonstration of adequate protection.  Id. at 566.

nonetheless noted in distinguishing a case where an equity cushion was present:

> We do not, however, imply by this observation that a creditor no matter how great its security can be adequately protected without receiving additional collateral or guarantees if the creation of a superpriority lien decreases its security.

Id. at 566 n. 17.

In a case that bears some resemblance to the contested matter before me, the Court held that an equity cushion may provide adequate protection but that an equity cushion alone will not be determinative.  In re Timber Products, Inc., 125 B.R. 433, 436 n.11 (Bankr. W.D. Pa. 1990) (citing cases so holding).[26]  Rather a number of factors are relevant to the adequate protection analysis,[27] the most significant of which in this case is SC's prospects for a

---

[26] Thus, the mathematical computation of the cushion and the various benchmarks that have been used in determining whether adequate protection for purposes of retaining the automatic stay are inappropriate in this context.  An equity cushion that will protect a prepetition secured creditor while its collateral is used in a reorganization does not necessarily protect a creditor whose liens have been subordinated.

[27] The Timber Products factors are:

(i)     Does the accrual of interest erode the equity cushion;

(ii)    Is the property depreciating or increasing in value;

(iii)   Has the debtor shown an inability to obtain refinancing since the filing;

(iv)    Has the debtor offered any other method of adequate protection;

(v)     Do current economic conditions suggest no realistic prospect for successful rehabilitation or reorganization under Chapter 11; and

(vi)    Has the Debtor's conduct of the litigation been more than a deliberate delaying tactic.

Id. at 433-34.  While I will set forth my findings on the Debtor's prospects in some detail, it is clear that the other four factors do not support the Debtor's request.  It is the Debtor's burden to establish

(continued...)

successful reorganization.  Id.  See also Bray v. Shenandoah Federal Savings and Loan Ass'n (In re Snowshoe Company), 789 F.2d 1085 (4th Cir. 1986) (while not opining whether an equity cushion alone would constitute adequate protection, the court found adequate protection was supported based on both the equity cushion and the "well-reasoned financial analysis of the trustee").

## II.

### A.

Against this legal framework, I find that Debtor has not met its burden of demonstrating that M&B is adequately protected even assuming a substantial equity cushion in the Real Property and Equipment.  My reason for so concluding is my judgment that SC cannot operate profitably, will default on its obligations to Lender and M&B will be impaired by its second lien position from realizing the value of its collateral.  The DIP Loan is a stopgap measure that will not restore Debtor to economic health before it becomes due, if at all.

---

(...continued)
that the existing secured creditor is adequately protected.  It has offered no other method of adequate protection, has not shown that the collateral will increase in value (indeed the contrary must be assumed with respect to the fixed assets) and interest continues to accrue on the debt.  Id. at 436 (borrowing will not enhance the collateral; rather it will depreciate while interest will accrue). Objectors have been litigating with Debtor in this and the state court since December 2006, having filed their first bankruptcy case to abort the state proceedings.  When the first bankruptcy case failed, it filed another.  The use of the automatic stay of a bankruptcy petition is a common device to protect a debtor from loss of its assets.  Where there is no prospect of reorganization, it is a deliberate delaying tactic.  However, as Debtor appears to believe that its business plan can succeed, I will conclude that the conduct of the litigation is more in the nature of a last ditch effort to survive rather than a delaying tactic.

SC has not operated profitably since 2000. While Thomas attributes its lack of financial success to the oppressive Commercial Contract it entered into with Soltex, the 15% commission required thereunder, and Soltex's failure to deliver on its marketing commitment, SC entered into that contract in 2005 after 4 unprofitable years. While SC may not have prospered under the Commercial Agreement, it did not fail because of it. Indeed it appears that the synergy contemplated by the parties under the Commercial Agreement was a hoped for financial and operational solution for SC's existing financial problems. Soltex's investment in that partnership went beyond the terms of the Commercial Contract as it advanced significant funds for the payment of operating expenses other than the raw materials it was obligated to provide. In effect SC acquired unsecured financing from Soltex without any interest cost. As SC is now prepared to accept a six month loan at 12% interest plus fees and costs, I am hard pressed to conclude that SC's unprofitability is attributable to Soltex's 15% charge. Moreover I find credible the testimony of Soltex's Controller Davies that as Soltex's investment in SC was substantial, it wanted SC to succeed.

Beginning with the reality that SC has historically been unable to generate profits, the Debtor was challenged to demonstrate how that circumstance would be altered by the proposed DIP Loan. Instead it has come forth with a short term plan that will enable it to resuscitate its anemic operations at the cost of M&B and with no reasonable prospects of a long term solution. The Cashflow it proffers makes this clear. It assumes that its sales will double in six weeks but provides no basis for such an assumption and has never achieved this level of sales before. Absent a foundation for these projections, there is no basis to rely upon

-18-

them.  Shaw Industries, Inc. v. First National Bank of PA. (In re Shaw), 300 B.R. 861, 866 (Bankr. W.D. Pa. 2003).  In addition to the soft revenue numbers, the expenses do not account for the projected increased production.  I do not find credible that the workforce is presently so underutilized that labor costs will not increase with a doubled production.  Nor do the attendant costs of manufacturing additional product such as utilities, nitrogen, gas and fuel oil, and drumming/shipping increase with increased sales.  There also is a fundamental flaw in SC's accounting in its failure to correctly calculate its margins which according to Davies, the most knowledgeable financial witness presented, have been overstated.[28]  Her conclusion that the projected margins of 50% had never been achieved because SC did not properly calculate its yields which should be set at 27% was convincing.[29]  Timbers Products, 125 B.R. at 438.[30]

Even giving credence to SC's speculative projections, it is clear that the contemplated DIP Loan will not shore up the floundering enterprise.  The committed funds are limited to $500,000 which will be exhausted by the third week.  Notwithstanding Minick's assurances

---

[28] The consultant Rehn did not have the experience with SC nor the credentials that Davies, a CPA with vast experience in the chemical industry and an impressive command of the specific accounting issues, had.

[29] Debtor's counsel chose not to present rebuttal testimony to Davies' analysis nor did he cross examine her on this point.  I therefore reject his attempt to impeach her conclusion by pointing out the former 15% charge imposed by Soltex and contending that it prevented it from achieving these margins.

[30] The Timbers Products court stated that the "major dispute involves the yield to be attained in the conversion process from cants to lumber and the profit margins from the ultimate sales of the finished product."  The court found unrealistic the debtor's estimated ability to achieve a 70 % yield which supported its ability to generate a 63% gross profit from sales of finished lumber generated from cants.  The lender's accounting expert testified that a yield of 60% would be more realistic.  The debtor's projected gross profit margin contrasted sharply with the industry average of 24%.

of Lender's interest in continuing to advance beyond the $500,000, he made it abundantly

clear that it was under no obligation to do so.[31]  Moreover, the criteria by which the extended

funds would be authorized are amorphous, underscoring the total discretion that Lender has

retained.  If Lender refuses to go forward past the first $500,000, there will be no conceivable

benefit to this transaction and significant detriment.  If, on the other hand, Lender continues

to fund as projected in the Cashflow, there is no accounting for how the loan will be repaid

in full at week 24 as the Loan Agreement requires.  While the Cashflow shows the DIP Loan

starting to be paid down at week 9, a balance of $750,000 remains as of week 18.  SC has not

indicated where it will secure this sum of money.  The likelihood that it can generate

$750,000 from operating profits is nonexistent.  Absent Lender entertaining an extension of

the loan term, which it has not stated it would do, SC will be in default when the DIP Loan

matures.

In the meantime M&B receives no payments but retains its second lien on all the

assets.  However, under the Proposed DIP Order as negotiated with Lender, its lien creditor

remedies are absolutely suspended until Lender is paid in full.  Proposed DIP Order at 9.[32]

It is true that the loss of first lien status in and of itself has been found not to evidence lack of

adequate protection for to so find would undermine the premise of § 364(d).  Anchor Savings

Bank v. Sky Valley, Inc., 99 B.R. 117, 123-24 (N.D. Ga. 1989).  However, where potential

and imminent default is as apparent as it is here and the priming lender has so tied the hands

---

[31] Indeed there are still conditions to closing of the Agreement and advancing the $500,000.
Of course, if Lender refuses to close, there is no harm to Objectors.

[32] Upon an event of default and four days' notice, (but not to M&B), Lender relieved from
the automatic stay of § 362 and neither SC nor M&B shall be entitled to any relief from this Court
other than a finding that no default has occurred.  Id. at 8.

of the existing lender as to render it unable to act, a different situation obtains.  The terms of

the Proposed DIP Order negate rather than confer adequate protection on M&B.

## B.

This dim view of the Debtor's prospects is not unmindful of the equity cushion that

exists in the Real Estate and improvements.  However,  I do not agree that it is as deep as

Debtor and its experts contend.  In re Windsor Hotel LLC, 295 B.R. 307, 314 (Bankr. C.D.

Ill. 2003) (court not bound by any expert opinion and many in the exercise of its sound

judgment accept or reject the valuation testimony).  Coyle reached his valuation opinion of

$3.1 million using the reconstruction cost approach because there were no sales that were

comparable.  I understand how that approach would be efficacious for insurance purposes.

Timber Products, 126 B.R. at 435 n.7.  I am not comfortable that it provides a valid sense of

what would be realized in a forced sale which would be the likely disposition in this case.

For example, it excludes the costs of sale which range from 2 to 7%.  Taking the average of

those numbers since Coyle did not opine on what deduction would be appropriate in this

case, his value would be reduced to slightly less than  $3 million.  Moreover Coyle had not

performed any analysis of the market for a facility with SC's attributes.  The reproduction

cost approach gives value to each of the 27 Buildings and Tanks even though a prospective

buyer may not have use for all of these components of the Real Property and would not

hypothetically reconstruct to acquire them.  I also have not convinced by Coyle's bare

statement that a buyer could be found in six months.  While I respect Coyle's experience and

knowledge in his field, he provided no basis for this conclusion. Deferral of a sale because

a suitable buyer, i.e., a chemical manufacturing company, cannot be located would impair

M&B's interest as interest continues to accrue on its debt.  Moreover, as the Lender would

control the sale of the Real Property until it was paid in full, there would be no incentive for

it to maximize the value and the value attributed by Coyle might never be reached.

With respect to the Personal Property, the 45-page List of Equipment with Thomas's

assigned values was the only evidence of value of those assets presented.[33]  However, the

vague explanation of how and when it was prepared undermines the credibility of the

document as evidence of value.  The actual List of Equipment was prepared by a third party

appraisal company at some uncertain time.  It was not clear whether Thomas placed his

values on that List of Equipment contemporaneously with the listing of the items or presently

for this hearing.  If the List was prepared some time ago as I suspect,[34] did Thomas verify

these items were still in SC's current inventory of  equipment? Assuming that the values

Thomas has fixed are reasonable, the forced sale number of $2.8 million versus the going

concern number of $5.9 million would be applicable based on my assessment of SC's dim

prospects for reorganization.  I must, however, make a negative adjustment for the Tanks

which overlapped Coyle's appraisal, so that the value of the machinery and equipment based

on the List of Equipment is approximately $2.0.  Based on this cumulative evidence, which

is qualified by the deficiencies noted above, the total value of the Real Property and

---

[33] A debtor is competent to give valuation testimony of property it owns Russell, Bankruptcy Evidence Manual, § 701.2 (2007 ed.) (citing case law).  A creditor would have to secure an appraiser to give expert testimony.  Given the expedited nature of the proceeding, a creditor would not had the opportunity to accomplish this.  As a result, the record has not benefitted from the proverbial battle of the appraisers.

[34] SC did not claim that Loeb had been engaged in this proceeding and has not had funds for this purpose since Objectors withdrew their support in December 2006.

Equipment is approximately $5 million.[35]  The principal and interest presently owed to

M&B is $3.1 million.  Even taking into account costs which have not been quantified, there

is clearly an equity cushion.  Why would that not be sufficient to adequately protect M&B?

The best indication of why the equity in SC's assets cannot protect a second lien is the

fact that it could not secure more than a $500,000 commitment for a new loan even with the

security of a first lien.  Further doubt as to the value of SC's assets to protect a lender is

evidenced by Sovereign's willing to sell its first position for $300,000 to exit the credit

facility?  The answer is that no one wants to lend into a foreclosure and test whether these

appraised values can be realized in a liquidation.  If a first lien lender will not commit to

greater than a $500,000 risk on these collateral values, the existing lender which has $3.1 at

risk is not adequately protected with the layering of additional debt and rights prior to its

own.  Absent some reasonable prospects of operational success which I found have not been

established, a second position will leave M&B in a compromised position with respect to its

secured position.  This is contrary to the well accepted principles articulated by the Third

Circuit in Swedeland.

Finally I note that the purpose of § 364(d) is to promote a reorganization of the

enterprise.  By allowing an infusion of new debt, it seeks to facilitate a plan that will inure

to the benefit of all creditors and the estate.  While 364(d) only requires that the interest of

the existing secured creditor be protected, it is not unmindful of the interests of other

creditors and that is the reason that the statutory analysis focuses on whether the prospects

---

[35] I have not included the value of the receivables or inventory based on the questions I have
posed earlier concerning their value as collateral.

of a reorganization are realistic.  In this case, in addition to M&B's $3.1 secured debt, Soltex

is owed $3.1 million and the filed Schedule F evidence as additional $2.3 million of

unsecured debt to in excess of 200 creditors.  Doc. No. 43 and 46.[36]  Where as here, there

does appear to be an equity cushion, unsecured creditors have the prospects of a meaningful

distribution in a liquidation.  To squander that value by permitting money to be lent into a

company with no history or proven ability to be profitable would be unwise.

## III.

Debtor had also sought the use of cash collateral in the Financing Motion.

The hearing did not address that request nor did it specify what amounts and what adequate

protection would be provided to M&B for its use.  Moreover, notwithstanding the pending

Payroll Motion, I learned at the hearing that Debtor had used M&B's cash collateral to make

a payroll, ignoring § 363 of the Bankruptcy Code which requires court approval or consent.

Given the contested cash collateral hearing held in the prior bankruptcy case, Debtor was

well aware of that restriction and apparently chose to act without regard to the law.  Unlike

the last cash collateral motion that was abandoned because there simply was no cash, the

Debtor had collected $61,000 the day of the hearing.  Also pending before me at the hearing

was an application for approval of Premium Financing which if granted would have put

insurance in place that has been lapsed since the last case.  When I questioned Debtor about

---

[36]   At this early juncture of the case, a meeting to consider formation of a creditors'
committee has not occurred.  The Order scheduling the expedited hearing on the Motions was served
on the 20 largest unsecured creditors but none appeared or filed an answer to the Financing Motions.
In the absence of a creditors' committee, I was disappointed that the United States trustee found her
statutory interests not implicated by the outcome of this contested matter and took no position on
whether the Financing Motion should be granted.  She did object to the terms of the Proposed
DIP Order.

using the $61,000 cash collateral for insurance, I was told it could not be spared for that purpose.

Because I do not know how the cash collateral is to be used and because SC appears to act without regard to its statutory duty regarding the use of cash collateral, I will deny this requested relief of the Financing Motion.  As there is no cash permitted to be used, I will deny the Premium Finance Motion notwithstanding my continued concern about the absence of this protection, as well as the Payroll Motion.

## CONCLUSION

For the foregoing reasons, the Motions will be denied.  An Order consistent with this Opinion shall be entered.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated:   March 19, 2007

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| STONEY CREEK TECHNOLOGIES, LLC, | : | Bankruptcy No. 07-11085DWS |
| | : | |
| Debtor. | : | |

# ORDER

**AND NOW**, this 19th day of March 2007, upon consideration of: (1) the Motion for Entry of Interim and Final Orders (i) Authorizing Debtor to Obtain Secured Post-Petition Financing and (ii) Authorizing Use of Cash Collateral (the "Financing Motion") (Doc. No. 11) and the Objection thereto by Synthetic Oils & Lubricants of Texas, Inc. d/b/a Soltex ("Soltex") and M&B Asset Management, Ltd. ("M&B") (together "Objectors") to the Financing Motion; (2) the Motion to Employ Outsource Financial Inc. (Doc. No. 14); (3) the Motion for Authority to Enter Into Insurance Premium Finance Agreement with U.S. Premium Finance (Doc. No. 12); and (4) the Motion to Pay Pre-Petition Payroll (Doc. No. 13) (collectively, the "Motions"), and for the reasons stated in the attached Memorandum Opinion;

It is hereby **ORDERED** that the Motions are **DENIED.**

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge